**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| **IN RE:** | § | |
| | § | |
| **BLUE WING GLOBAL LOGISTICS,** | § | **CASE NO. 08-34834** |
| | § | **CHAPTER 7** |
| Debtor | § | |

# EXHIBIT A

## ENDORSEMENT# *24*

This endorsement, effective *12:01 am*     *January 1, 2008*         forms a part of
policy number    *041-83-93*
issued to *BLUE WING GLOBAL LOGISTICS, INC.*

by    *National Union Fire Insurance Company of Pittsburgh, Pa.*

### DISCOVERY ELECTED

In consideration of the additional premium of *$32,629*         , it is hereby understood
and agreed that pursuant to the terms and conditions of the DISCOVERY CLAUSE in each
respective Coverage Section(s) (other than the Crime Coverage Section) the policy shall
be amended with the following:

The Coverage Afforded By This Endorsement Shall Be Applicable To The Following
Coverage Section(s) Selected:

| | | |
|---|---|---|
| *X* D&O Coverage | Employed Lawyers Coverage | |
| *X* EPL Coverage | Media Liability Coverage | |
| *X* PTL Coverage | All Coverages Sections (other than the Crime Coverage Section) | |

This policy as of *January 1, 2008*        ("Effective Time") shall be amended as follows:

(1)   The DISCOVERY CLAUSE applicable to each Coverage Section selected above, is
deleted in its entirety and replaced with the following:

RUN-OFF COVERAGE CLAUSE

The Named Entity shall have a   *3* year period following the Effective Time
(herein referred to as the Discovery Period) in which to give written notice to
the Insurer of Claim(s) first made against the Insured(s) during said   *3* year
period for any Wrongful Act(s) occurring on or prior to the Effective Time and
otherwise covered by this policy.

(2)   The CANCELLATION CLAUSE, as set forth in the General Terms and Conditions
Section is deleted in its entirety and replaced with the following:

CANCELLATION CLAUSE

This policy may not be canceled by or on the behalf of Named Entity or the
Insurer except as stated below. The Insurer may only cancel this policy in the
event of nonpayment of premium by the Named Entity (including the
nonpayment of any additional premium for this endorsement). The Insurer shall
cancel this policy by delivering to the Named Entity or by mailing to the
Named Entity, by registered, certified, or other first class mail, at the Named
Entity's address as shown in Item 1. of the Declarations page, written notice
stating when, not less than ten (10) days thereafter, the cancellation shall be
effective. The mailing of such notice as aforesaid shall be sufficient proof of
notice. The Policy Period (or Discovery Period, as the case may be) terminates
at the date and hour specified in such notice.

### END 024

**ENDORSEMENT#** *24* (continued)

If the period of limitation relating to the giving of notice is prohibited or made void by any law controlling their construction thereof, such period shall be deemed to be amended so as to be equal to the minimum period of limitation permitted by such law.

It is further understood and agreed that the entire premium charged for this policy and this endorsement shall be fully earned as of the Effective Time.

(3) The CHANGE IN CONTROL OF NAMED ENTITY Clause, as set forth in the General Terms and Conditions Section is deleted in its entirety.

(4) It is further understood and agreed that notwithstanding any other provision of this policy, this policy shall not provide coverage for any Claim(s) alleging Wrongful Act(s) occurring after the Effective Time.

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.

AUTHORIZED REPRESENTATIVE

*END 024*

86348 (7/04)  ***BROArchive Copy***  Page 2 of 2

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| **IN RE:** | § | |
| | § | |
| **BLUE WING GLOBAL LOGISTICS,** | § | **CASE NO. 08-34834** |
| | § | **CHAPTER 7** |
| **Debtor** | § | |

# EXHIBIT B

Execution Version

---

## ASSET PURCHASE AGREEMENT

**Dated as of October 11, 2007**

**By and Among**

**BW/STS ACQUISITION LLC**

**a Delaware limited liability company,**

**as the Purchaser,**

**BLUE WING GLOBAL LOGISTICS, INC.**

**a Delaware corporation,**

**and**

**BLUE WING TRANSPORTATION, INC.,**

**a Texas corporation,**

**collectively, as the Seller**

## TABLE OF CONTENTS

**ARTICLE I PURCHASE AND SALE OF PURCHASED ASSETS** ........................................................ 1

| | | |
|---|---|---|
| 1.1 | Purchased Assets. | 1 |
| 1.2 | Retained Assets. | 2 |
| 1.3 | Assumption of Liabilities. | 3 |
| 1.4 | Retained Liabilities. | 3 |
| 1.5 | Purchase Price. | 3 |
| 1.6 | Closing. | 4 |
| 1.7 | Allocation of Purchase Price. | 4 |
| 1.8 | Closing Prorations and Closing Costs. | 4 |
| 1.9 | Accounting Methodology. | 5 |
| 1.10 | Earn Out Payment. | 5 |
| 1.11 | Other Matters. | 6 |

**ARTICLE II REPRESENTATIONS & WARRANTIES OF THE SELLER** ..................................... 6

| | | |
|---|---|---|
| 2.1 | Organization and Existence. | 7 |
| 2.2 | Execution and Effect of Agreement. | 7 |
| 2.3 | Personal Property. | 7 |
| 2.4 | Real Property; Lease of Real Property. | 7 |
| 2.5 | Brokers. | 8 |
| 2.6 | As Is, Where Is Sale. | 8 |
| 2.7 | Authority. | 8 |
| 2.8 | Non-Contravention. | 8 |
| 2.9 | No Consents. | 8 |
| 2.10 | Financial Statements. | 8 |
| 2.11 | Absence of Undisclosed Liabilities. | 9 |
| 2.12 | Litigation Matters. | 9 |
| 2.13 | Compliance with Laws; Permits. | 9 |
| 2.14 | Environmental Laws. | 10 |
| 2.15 | Material Contracts. | 10 |
| 2.16 | Tax Matters. | 10 |
| 2.17 | [INTENTIONALLY OMITTED] | 11 |
| 2.18 | [INTENTIONALLY OMITTED] | 11 |
| 2.19 | Purchased Assets. | 11 |
| 2.20 | Accounts Receivable. | 11 |
| 2.21 | [INTENTIONALLY OMITTED] | 11 |
| 2.22 | Intellectual Property. | 11 |
| 2.23 | Customers; Suppliers. | 12 |
| 2.24 | ERISA Matters. | 12 |
| 2.25 | Employees; Labor Relations. | 12 |
| 2.26 | Insurance. | 13 |
| 2.27 | Certain Business Relationships. | 13 |
| 2.28 | Sales Warranties. | 13 |
| 2.29 | Certain Business Practices. | 14 |

**ARTICLE III REPRESENTATIONS AND WARRANTIES OF THE PURCHASER** ..................... 14

i

| 3.1 | Organization and Existence. | 14 |
| 3.2 | Execution and Effect of Agreement. | 14 |
| 3.3 | Full Authority. | 14 |
| 3.4 | No Brokers. | 14 |
| 3.5 | Financial Capabilities. | 15 |

**ARTICLE IV COVENANTS** .......... **15**

| 4.1 | Employee Matters. | 15 |
| 4.2 | Freight Forwarding Acquisitions. | 15 |
| 4.3 | Bulk Transfer Laws. | 15 |
| 4.4 | Change of Name. | 15 |
| 4.5 | Confidential Information. | 16 |
| 4.6 | Restrictions on Competition. | 16 |
| 4.7 | Nonsolicitation. | 16 |
| 4.8 | Nature of Restrictions; Enforcement. | 17 |
| 4.9 | Sale of the Purchaser or its Assets. | 17 |
| 4.10 | Pre-Closing Covenants. | 18 |

**ARTICLE V CONDITIONS TO THE CLOSING** .......... **18**

| 5.1 | Conditions to the Obligations of the Seller to Effect the Closing. | 18 |
| 5.2 | Conditions to the Obligations of the Purchaser to Effect the Closing. | 19 |
| 5.3 | Option to Terminate Agreement. | 20 |

**ARTICLE VI INDEMNIFICATION; REMEDIES** .......... **21**

| 6.1 | Obligations of the Seller. | 21 |
| 6.2 | Obligations of the Purchaser. | 21 |
| 6.3 | Procedure for Claims. | 22 |
| 6.4 | Survival. | 22 |
| 6.5 | Indemnity Payments. | 23 |
| 6.6 | Limitations on Indemnification Obligations Under Article VI. | 23 |
| 6.7 | Remedies. | 23 |
| 6.8 | Right of Offset. | 24 |
| 6.9 | Treatment of Indemnification Payments. | 24 |

**ARTICLE VII GENERAL PROVISIONS** .......... **24**

| 7.1 | Press Releases. | 24 |
| 7.2 | Expenses. | 24 |
| 7.3 | Amendments and Waivers. | 24 |
| 7.4 | Successors and Assigns. | 24 |
| 7.5 | No Third Party Beneficiaries. | 24 |
| 7.6 | Choice of Law. | 25 |
| 7.7 | Jurisdiction; Service of Process. | 25 |
| 7.8 | Waiver of Jury Trial. | 25 |
| 7.9 | Notices. | 25 |
| 7.10 | Severability. | 26 |
| 7.11 | Entire Agreement. | 26 |
| 7.12 | Construction. | 26 |
| 7.13 | Titles and Subtitles. | 26 |

7.14 Counterparts. ................................................................................................................... 26

**SCHEDULES**

Schedule 1.1(a)(ii)        Real Property Leases
Schedule 1.1(a)(iii)       Equipment, Furniture and Fixtures
Schedule 1.2(c)            Retained Assets
Schedule 1.3(d)            Employee and Consultant Benefits Accrued
Schedule 1.3(e)            Trade Accounts Payable and Accrued Expenses
Schedule 2.10              Financial Statements
Schedule 2.12              Absence of Undisclosed Liabilities
Schedule 2.12              Litigation Matters
Schedule 2.13              Compliance with Laws and Permits
Schedule 2.15              Material Contracts
Schedule 2.16              Tax Matters
Schedule 2.20              Accounts Receivables
Schedule 2.23              Customers; Suppliers
Schedule 2.25              Employees; Labor Relations
Schedule 2.25(b)           Labor Agreements

**<u>EXHIBITS</u>**

Exhibit A

## ASSET PURCHASE AGREEMENT

**THIS ASSET PURCHASE AGREEMENT** (this "Agreement"), dated as of October 11, 2007 (the "Effective Date"), is by and among BW/STS ACQUISITION LLC, a Delaware limited liability company (the "Purchaser"), BLUE WING GLOBAL LOGISTICS, INC., a Delaware corporation ("Global"), BLUE WING TRANSPORTATION, INC., a Texas corporation ("Trucking"; collectively, with Global, the "Seller"). The Purchaser, the Seller and the Shareholder are referred to hereinafter collectively as the "Parties" or individually as a "Party".

## R E C I T A L S

**WHEREAS,** the Seller is engaged in the business of global transportation logistics (collectively, the "Business");

**WHEREAS,** the Seller desires to sell, convey, transfer, assign and deliver to the Purchaser, and the Purchaser desires to purchase and acquire from the Seller, substantially all of the assets of the Seller, as more particularly set forth herein, together with certain obligations and liabilities relating thereto, free and clear of all liens (the "Acquisition"); and

**WHEREAS,** in furtherance of the agreed consummation of the Acquisition, the Parties desire to enter into this Agreement.

**NOW, THEREFORE,** in consideration of the promises contained herein and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties, intending to be legally bound, hereby agree as follows:

## A G R E E M E N T

## ARTICLE I

## PURCHASE AND SALE OF PURCHASED ASSETS

1.1     Purchased Assets.

(a)     Subject to the terms and conditions of this Agreement, the Seller hereby agrees to sell, convey, transfer, assign and deliver to the Purchaser, and the Purchaser hereby agrees to purchase and acquire from the Seller, free and clear of any lien, security interest, mortgage, pledge, hypothecation or other title retention agreement or other restrictions (collectively, the "Liens"), all right, title and interest in and to all of the assets used or held for use by Global or Trucking in connection with the Business, of every kind and wherever situated, which are owned by the Seller or in which the Seller has any right, title or interest, other than the Retained Assets (collectively, the "Purchased Assets"), including, without limitation:

(i)     all rights of the Seller under the contracts and agreements to which it is a party in respect of the Business, to the extent assignable (collectively, the "Assigned Contracts");

(ii)     all rights of the Seller under the commercial leases (the "Real Property Leases") for the real property located in Irving, Texas, Atlanta, Georgia and Bridgewater, New Jersey, as more particularly described on Schedule 1.1 (a)(ii) together with all easements, rights-of-way, reservations, uses, licenses, appurtenances and privileges relating thereto and other estates and rights benefiting such leasehold estate (collectively, the "Leased Real Property");

(iii)    all machinery and equipment, furniture and fixtures, supplies and other tangible personal property used in the Business whether owned or leased by the Seller, as more particularly described on Schedule 1.1(a)(iii);

(iv)    all licenses, permits, certificates, certificates of occupancy, orders, authorizations, special exceptions and approvals, to the extent assignable (collectively, the "Permits");

(v)    all Intellectual Property Rights of the Seller relating to the trade names "Blue Wing Global Logistics, Inc.", "Blue Wing Transportation, Inc." and derivations thereof;

(vi)    all business records relating to the Purchased Assets and the Business (the "Business Records");

(vii)    all lists of customers, suppliers, marketing literature, electronic systems and databases and goodwill relating to the Business;

(viii)    all information contained in any software relating to the Business, in a format capable of being downloaded to the Purchaser;

(ix)    any cash deposits received by the Seller as of the Closing Date which constitute unearned revenue to the Seller from third parties for services that the Seller has agreed to perform on behalf of such third parties but which have not been performed on or prior to Closing;

(x)    all trade accounts receivable and other rights to payment from customers of the Seller and the full benefit of all security for such accounts or rights to payment, all other accounts or notes receivable of the Seller and the full benefit of all security for such accounts or notes and any claim, remedy or other right related to any of the foregoing; and

(xi)    all payments made by the Seller as of the Closing Date which constitute prepaid expenses in accordance with generally accepted accounting principles ("GAAP").

(b)    Notwithstanding the foregoing, to the extent that the Seller is not the legal owner of any of the Purchased Assets described above, the Seller shall cause its Affiliates (as defined below) or such other legal owner to transfer such assets to the Purchaser free and clear of all Liens without any consideration other than the consideration to the Seller as set forth in this Agreement. "Affiliate" of any the Seller or the Purchaser means any other person directly or indirectly, through one or more intermediary persons, Controlling, Controlled by or under common Control (each as defined below) with such entity and shall include in each case all of such entity's officers, directors, agents, employees, and subsidiaries. "Control" with respect to any person, means the power to direct the management and policies of such entity, directly or indirectly, by or through stock or unit ownership, agency or otherwise, or pursuant to or in connection with an agreement, arrangement or understanding (written or oral) with one or more other entity or entities by or through stock or unit ownership, agency or otherwise. "Controlling" and "Controlled" have meanings correlative to the foregoing.

1.2    Retained Assets.

Notwithstanding any other provision herein to the contrary, the Purchased Assets shall not include the following (said assets being referred to collectively as the "Retained Assets"):

(a)    any net operating loss carry forwards and similar tax attributes of the Seller;

(b)      all minute books, stock records, share certificates and corporate seals, tax returns, financial records, and other similar records and/or reports of the Seller; and

(c)      those assets relating to personal property of the Seller employees and executives as set forth on Schedule 1.2(c).

1.3      Assumption of Liabilities.

Upon and subject to the terms, conditions, representations and warranties of the Seller contained herein, and subject to Section 1.4, the Purchaser hereby agrees to assume and hereby agrees to pay, perform and discharge when due the Liabilities (as defined in Section 1.4) of the Seller: (a) relating to the Purchased Assets described under Section 1.1(a)(ix); (b) under the Assigned Contracts which relate to periods following the Closing Date and are to be observed, paid, performed or discharged, as the case may be, in each case at any time after the Closing Date; (c) under the Real Property Leases which relate to periods following the Closing Date and are to be observed, paid, performed or discharged, as the case may be, in each case at any time after the Closing Date; (d) all Liabilities for employee or independent contractor compensation and benefits accrued or otherwise arising out of services rendered by the employees, and independent contractors of the Seller prior to the Closing listed on Schedule 1.3(d); and (e) all trade accounts payable and accrued expenses of the Seller relating the operations of the Business through and including the Closing Date listed on Schedule 1.3(e) (collectively, the "Assumed Liabilities").

1.4      Retained Liabilities.

(a)      Except for the Assumed Liabilities, (i) the Purchaser shall not assume, and shall have no direct or indirect indebtedness, liability, assessment, claim, loss, damage, deficiency, obligation or responsibility ("Liability" or "Liabilities") for, any Liabilities, taxes or contracts of the Seller of any kind, character or description, whether accrued, absolute, contingent or otherwise, it being understood that the Purchaser is expressly disclaiming any express or implied assumption of any Liabilities other than the Assumed Liabilities and (ii) the Seller shall pay, perform, and discharge when due and remain exclusively liable for any and all Liabilities of the Seller (collectively, the "Retained Liabilities").

1.5      Purchase Price.

(a)      The aggregate consideration for the Purchased Assets (the "Purchase Price") and the payment thereof shall be as follows:

(i)      At the Closing, the Purchaser shall pay to the Seller, via wire transfer of immediately available funds to the bank and account designated by the Seller, an amount equal to (A) One and No/100 Dollars ($1.00), plus or minus (B) the amount of the prorations and closing costs described in Section 1.8 that are determinable as of the Closing Date;

(ii)      At the Closing, the Purchaser shall execute and deliver to the Seller a General Conveyance, Assignment, Bill of Sale and Assumption Agreement on the Closing Date, substantially in the form attached hereto as Exhibit A (the "Assignment and Assumption Agreement"), evidencing the assignment by the Seller of the Purchased Assets and the assumption by the Purchaser of the Assumed Liabilities; and

(iii)      The Earn Out Payments shall be payable in the manner specified in Section 1.10 below;

(iv)     No later than thirty (30) days after the Closing Date, the prorations and closing costs described in Section 1.8 that are not determinable as of the Closing Date shall be paid by the Seller or the Purchaser to the other Party, as the case may be, via wire transfer of immediately available funds to the bank and account designated by the recipient.

1.6     Closing.

Unless otherwise mutually agreed upon by the Parties in writing, the closing of the Acquisition (the "Closing") shall take place on or before October 31, 2007 at the offices of the Seller or another place mutually agreed upon by the Parties; provided, however, that all of the conditions precedent to the Closing hereunder shall have been satisfied or waived. Time is of the essence. The date of the Closing is hereinafter called the "Closing Date." The Parties hereby agree to deliver at the Closing such documents, certificates and other instruments as are specified in Article V hereof and as may be reasonably required by the Purchaser or the Seller to effect the transfer by the Seller of the Purchased Assets pursuant to and as contemplated by this Agreement and to consummate the Acquisition. All events which shall occur at the Closing shall be deemed to occur simultaneously.

1.7     Allocation of Purchase Price.

The parties agree that, within thirty (30) days after the Closing Date, the Purchaser will provide to the Seller, for the Seller's review and approval (which review and approval shall not be unreasonably withheld, conditioned or delayed), the tax allocation of the Purchased Assets (the "Purchase Price Allocation") which will be used to complete Internal Revenue Service Form 8594: Asset Acquisition Statement under Section 1060, including any required amendments or supplements thereto ("Form 8594"). The Parties further agree that: (a) the Purchase Price shall be allocated among the Purchased Assets based on the values set forth in the Purchase Price Allocation, as mutually agreed upon by the Seller and the Purchaser; (b) such allocation shall be binding on the Parties for federal, state and local tax purposes; and (c) the Purchaser and the Seller shall file Form 8594 with their respective federal income tax returns reflecting such allocation.

1.8     Closing Prorations and Closing Costs.

The following items and costs shall be prorated (on the Closing Date or as soon thereafter as is practicable) between the Seller and the Purchaser in the manner indicated:

(a)     All sales and use taxes associated with the Acquisition shall be borne equally by the Purchaser and the Seller;

(b)     All taxes with respect to the Purchased Assets which are due and payable prior to the Closing Date, shall be paid by the Seller on or prior to the Closing Date; and

(c)     All property taxes shall be prorated as set forth below based on the most recently ascertainable property tax bill.

For purposes of calculating prorations, the Seller shall be deemed to be in title to the Purchased Assets for the entire day on the Closing Date. All such prorations shall be made on the basis of the actual number of days of the year and month which shall have elapsed as of the Closing Date. To the extent not ascertainable on the Closing Date, the amount of such prorations shall be adjusted in cash after the Closing Date as and when complete and accurate information becomes available. The Seller and the Purchaser agree to cooperate and use their diligent and good faith efforts to make such adjustments no later than thirty (30) days after the Closing Date. Items of income and expense for the period prior to the

Closing Date will be for the account of the Seller and items of income and expense for the period on and after the Closing Date will be for the account of the Purchaser.

1.9    Accounting Methodology.

Unless otherwise noted, the agreed financial measures used in this Agreement will be determined in accordance with GAAP.

1.10    Earn Out Payment.

(a)    As soon as practicable (and in any event within sixty (60) days) following December 31, 2009, and for each of the next four (4) anniversaries of such date, the Purchaser shall prepare and deliver to the Seller and its counsel a statement of the gross profit of the Purchaser as determined in accordance with GAAP (the "Gross Profit") for (i) the period commencing on the Closing Date and ending on December 31, 2009, (ii) the twelve (12) month period ending on each of the next three (3) anniversaries of such date and (iii) the nine month period ending on September 30, 2013 (each, a "Gross Profit Statement"), a calculation of the Earn Out Payment (as defined below) based on the Gross Profit for each period specified in clauses (i), (ii) and (iii) above, as applicable (the "Earn Out Payment Calculation") and all work papers relating thereto (the "Earn Out Payment Documentation"). The "Earn Out Payment" means the amounts determined by the product of (x) .10 and (y) the Gross Profit for the applicable fiscal period coinciding with each Earn Out Payment calculation, as reduced by the "Agreed Offsets" described below, as shown on the applicable Gross Profit Statement; provided, however, that under no circumstances shall the sum of the aggregate Earn Out Payments be greater than Four Million Five Hundred Thousand and No/100 Dollars ($4,500,000.00). For purposes of any Earn Out Payment through the end of the Indemnification Period (as defined in Section 6.4 below), the Purchaser shall have the right to offset the following items (collectively, the "Agreed Offsets") against such Earn Out Payment:

(i)    The excess of accounts payable of the Seller over sixty (60) days old paid by the Purchaser in accordance with the Seller's August 31, 2007 unaudited interim financial statements (the "Closing Financial Statements"), over accounts receivable of the Seller over sixty (60) days old collected by the Purchaser in accordance with the Closing Financial Statements;

(ii)    Attorneys fees and costs accrued on the Closing Financial Statements or associated with the negotiation and Closing of the Agreement and related Transactions;

(iii)    Lease Payments paid by the Purchaser for the leased facilities of the Seller other than as included in the Assumed Liabilities; and

(iv)    Any amounts described in Section 6.5(b) below.

(b)    The Earn Out Payment Calculation shall be conclusive and binding on the Parties unless the Seller gives written notice to the Purchaser within twenty (20) days after the Seller's receipt of the Earn Out Payment Documentation of any objections thereto setting forth in reasonable detail the amounts in dispute and the basis for such dispute (a "Earn Out Payment Objection Notice"). If the Seller delivers an Earn Out Payment Objection Notice as provided above, the Parties shall attempt in good faith to resolve such dispute, and any resolution by them as to any disputed amounts shall be final, binding and conclusive on the Parties.

(c)    If the Parties are unable to resolve, despite good faith negotiations, all disputes reflected in the Earn Out Payment Objection Notice within ten (10) days thereafter (the "Earn Out Payment Resolution Period"), then the Parties will, within ten (10) days after the expiration of the Earn Out Payment Resolution Period, submit any such unresolved dispute to a regionally recognized independent accountant, selected by the Purchaser and the Seller in good faith. Each of Purchaser and the

Seller shall provide to the independent accountant all work papers and back-up materials relating to the unresolved disputes requested by the independent accountant. Each of the Purchaser and the Seller shall be afforded the opportunity to present to the independent accountant any material related to the unresolved disputes and to discuss the issues with the independent accountant. The determination by the independent accountant, as set forth in a notice to be delivered to the Purchaser and the Seller within thirty (30) days after the submission of the unresolved disputes to the independent accountant, shall be final, binding and conclusive on the Parties. The fees and expenses of the independent accountant shall be paid by the Seller; provided, however, that if the independent accountant's calculation of any Earn Out Payment exceeds the amount of such Earn Out Payments as originally calculated by the Purchaser by more than ten percent (10%) of Purchaser's original calculation, then the cost of the services of the independent accountant shall be paid by the Purchaser.

(d)     Each Earn Out Payment, as revised to reflect the resolution of any and all disputes by the Parties or the independent accountant in accordance with the provisions of this Section 1.10, shall be paid by the Purchaser via wire transfer of immediately available funds to the bank and account designated by the Seller within five (5) business days after the date on which any Earn Out Payment has been determined pursuant to the provisions of this Section 1.10. Notwithstanding the foregoing, the Purchaser shall be permitted to defer payment to the Seller of some or all of such Earn Out Payment to the extent of the Purchaser's good faith estimate of any outstanding indemnity claim under Section 6.1 hereof. If payment of any portion of an Earn Out Payment is deferred pursuant to this Section 1.10(d) attributable to an outstanding claim to which the Purchaser is entitled to indemnification pursuant to Article VI, such amount shall be deposited by the Purchaser into an escrow account with a third party escrow agent until such claim is resolved by agreement between the Seller and the Purchaser or by a court order or arbitration award.

(e)     For purposes of calculating any Earn Out Payment or component thereof, the Purchaser shall continue the Seller's method of accounting practices as to calculating gross revenue utilized as of the Closing Date.

1.11    Other Matters.

The Purchaser and the Seller mutually agree to cooperate fully to accomplish an orderly transition of the Business. The Seller agrees to refer to the Purchaser all customer, supplier or employee inquiries relating to the operation of the Business or the ownership and use of the Purchased Assets after the Closing Date. The Seller further agrees to remit promptly to the Purchaser all payments and invoices received after Closing with respect to the Purchased Assets and operation of the Business after the Closing Date. The Purchaser further agrees to remit promptly to the Seller all payments received after Closing with respect to the Retained Assets. Without limiting the foregoing, the Parties hereto acknowledge and agree that the Purchaser shall be entitled to realize all income generated from the Purchased Assets on and after the Closing. If any customer pays the Seller with respect to the same, the Seller shall remit to the Purchaser, as soon as commercially practicable after receipt, all payments so received from each such customer. The Seller shall provide such reasonable cooperation and assistance as may be requested by the Purchaser from time to time to assist with the collection of any amounts due with respect to any of the Purchased Assets.

## ARTICLE II

### REPRESENTATIONS & WARRANTIES OF THE SELLER

As an inducement to the Purchaser to enter into this Agreement and to consummate the Acquisition, the Seller represents and warrants to the Purchaser that the following representations and warranties are true and correct as of the Closing Date.

2.1     Organization and Existence.

Each Seller is a corporation duly organized, validly existing and in good standing under the laws of the State of Delaware or Texas, as applicable.  Each Seller is duly qualified to transact business as a foreign corporation in all jurisdictions in which the nature of such Seller's business or the character of the properties owned or leased by such Seller requires such licensing or qualification.

2.2     Execution and Effect of Agreement.

Each Seller has full power and authority to execute and deliver this Agreement and each of the other agreements, certificates, schedules and instruments to be executed and delivered in connection with the consummation of the Acquisition (collectively, the "Transaction Documents") to which it is a party, to perform its obligations hereunder and thereunder, and consummate the Acquisition.  The execution, delivery and performance by the Seller of this Agreement and the other Transaction Documents to which it is a party and the consummation by the Seller of the Acquisition have been duly and validly authorized and approved by the Seller and no other proceeding on the part of the Seller is necessary to authorize the execution, delivery and performance by the Seller of this Agreement or the other Transaction Documents to which the Purchaser is a party or the consummation of the Acquisition.  This Agreement and the other Transaction Documents to which the Seller is a party have been duly and validly executed and delivered by the Seller and constitute the legal, valid and binding obligations of the Seller, enforceable against the Seller in accordance with their respective terms, except as limited by applicable bankruptcy, insolvency, fraudulent conveyance, reorganization, moratorium and similar laws affecting creditors' rights and remedies generally, and subject as to enforceability, to general principles of equity (collectively, the "Bankruptcy and Equity Exceptions").

2.3     Personal Property.

The Seller has good and marketable title to, or a valid leasehold interest in, or license of, all tangible personal property used in the Business.  Except for the first lien of First Capital to be released at Closing, such tangible personal property is free and clear of any and all Liens.  The Seller owns or leases under valid leases all buildings, machinery, equipment, and other tangible assets necessary for the conduct of the Seller's business as currently conducted and as currently proposed to be conducted.  Schedule 1.1(a)(iii) sets forth a true and complete list of all equipment, machinery, and other personal property other than items having a net book value of less than Five Thousand and No/100 Dollars ($5,000) individually owned by the Seller.

2.4     Real Property; Lease of Real Property.

        (a)     The Seller does not own fee simple title to any real property.

        (b)     There is no lease of real property or rights therein under which the Seller, with respect to the Business, is a lessee or sublessee other than the Leased Real Property, as such leases are more particularly described on Schedule 1.1(a)(ii) (the "Real Property Leases").  A complete and correct copy of the Real Property Leases and all amendments thereto have been furnished to the Purchaser.  There are no unrecorded covenants, deed restrictions, easements, leases, subleases or rights of occupancy or Liens that encumber the Real Property Leases or any of the property demised under the Real Property Leases.

        (c)     Each Real Property Lease is valid, existing, in full force and effect, binding upon and enforceable against the Seller and the other parties thereto in accordance with its terms.  The interests and/or leasehold estate created by each Real Property Lease is free and clear of all Liens except permitted statutory landlord liens.  The Seller has neither delivered nor received written notice of any alleged

default by any party to a Real Property Lease and is not in material breach of or default under any of the Real Property Leases, nor to the actual knowledge of the Seller is any other party to any Real Property Lease in material breach of or default under such Real Property Lease, nor does any condition exist that, with or without notice, lapse of time or the happening or occurrence of any other event, is likely to result in a material breach of or default by the Seller or, to the actual knowledge of the Seller, any third party, under any Real Property Lease. The Seller has furnished to the Purchaser prior to the execution and delivery of this Agreement true and complete copies of all Real Property Leases.

2.5    Brokers.

Neither the Seller nor any person acting on behalf of the Seller has agreed to pay a commission, finder's or investment banking fee, or similar payment in connection with this Agreement or any matter related hereto to any person, other than Eve Partners.

2.6    As Is, Where Is Sale.

Except as expressly provided in this Agreement to the contrary, the Seller and the Purchaser intend for the Acquisition of the Assets and the Business to be an "AS IS, WHERE IS" sale without specific warranties and representations.

2.7    Authority.

The Seller has the full power and authority to (a) own and/or hold under lease its assets and properties (including, without limitation, the Purchased Assets), and (b) carry on its business (including, without limitation, the Business) as currently conducted and as currently proposed to be conducted.

2.8    Non-Contravention.

The execution and delivery by the Seller of this Agreement and the other Transaction Documents, the performance by the Seller of its obligations hereunder and thereunder, and the consummation by the Seller of the transactions contemplated hereby and thereby do not and will not (i) conflict with, (ii) result in any violation of or default (with or without notice or lapse of time or both) under, (iii) give rise to a right of termination, cancellation, or acceleration under, (iv) result in the creation or imposition of any Lien under, or (v) result in the loss of a material benefit under or with respect to (A) any provision of the Seller's articles or certificate of incorporation or bylaws (each as amended to date), (B) to the actual knowledge of the Seller, any applicable law, (C) any permit or governmental order, or (D) any Contract to which the Seller is a party or by which the Seller is bound, or to which any of the Seller's assets or properties (including, without limitation, the Purchased Assets) is subject.

2.9    No Consents.

The Seller is not required to give any notice to, make any filing with, or obtain any authorization, consent, permit, certificate, or approval of, any governmental authority or third party in order to consummate the transactions contemplated by this Agreement and the other Transaction Documents.

2.10    Financial Statements.

Attached hereto as Schedule 2.10 are the following financial statements: the unaudited consolidated and consolidating balance sheets of the Seller as of August 31, 2007 (the "Closing Balance Sheet"), and the related statements of income and cash flows (or the equivalent) for the eight (8) month period then ended. To the Seller's actual knowledge, each of the foregoing financial statements (collectively, the "Financial Statements") fairly present in all material respects the Seller's financial

condition and results of operations and cash flows as of the times and for the periods referred to therein. To the Seller's actual knowledge, the Closing Balance Sheet has additionally been prepared in accordance with GAAP in all material respects, subject in the case of unaudited financial statements to the absence of footnote disclosure.

2.11    Absence of Undisclosed Liabilities.

The Seller does not have any Liabilities, whether absolute, contingent, fixed, matured, unmatured, liquidated, unliquidated, choate, inchoate, secured, unsecured or otherwise and whether due or to become due relating to or incurred in connection with the Business, except for (a) Liabilities listed in Schedule 2.11; and (b) Liabilities arising after August 31, 2007 that satisfy both of the following criteria: (i) such Liabilities were incurred by the Seller in the ordinary course of business consistent with past custom and practice ("Ordinary Course of Business"), and (ii) such Liabilities do not exceed Ten Thousand and No/100 Dollars ($10,000) individually or Fifty Thousand and No/100 Dollars ($50,000) in the aggregate.

2.12    Litigation Matters.

Schedule 2.12 attached hereto sets forth all actions, suits, proceedings, orders, judgments, decrees or investigations against the Seller during the two (2) year period preceding the date hereof. Except as set forth on the Schedule 2.12 attached hereto, there are no actions, suits, proceedings, orders, judgments, decrees, or investigations pending or, to the Seller's actual knowledge, threatened against the Seller (or against any of the Seller's officers, directors, agents, or employees) (in each case, in their capacity as such) at law or in equity, or before or by any federal, state, municipal, or other governmental department, commission, board, bureau, agency, or instrumentality, domestic or foreign, and to the actual knowledge of the Seller, there is no reasonable basis known for any of the foregoing. The Seller is not subject to any outstanding order, judgment, or decree issued by any court or quasijudicial or administrative agency of any federal, state, local, or foreign jurisdiction or any arbitrator. Schedule 2.12 sets forth accurately and completely the following information with respect to each matter listed thereon: the name of and parties to the proceeding, the date of the commencement of the proceeding, the status of the proceeding (e.g., in settlement talks, discovery, trial, appeal, etc.), a brief statement of the nature of the claim, the amount being claimed and/or the nature of other relief sought, the amount of reserves taken, if any, on the Closing Balance Sheet in respect of such proceeding, an evaluation of the merit of such claim, and the current settlement range, if any, among the parties, and any other material information related to such proceeding. There is no claim, action, suit, proceeding or governmental investigation pending or, to the actual knowledge of the Seller, threatened against the Seller, by or before any court, governmental or regulatory authority or by any third party which challenges the validity of this Agreement or which would be reasonably likely to adversely affect or restrict the Seller's ability to consummate the transactions contemplated hereby. No employee or independent contractor has filed or, to the Seller's actual knowledge, threatened any whistleblower action alleging violation of any applicable law against the Seller.

2.13    Compliance with Laws; Permits.

The Seller has complied, and is presently in compliance in each case, in all material respects, with all applicable laws or governmental orders applicable to it or to the Business or the Purchased Assets. The Seller has all permits, approvals, and licenses necessary for the conduct and operation of the Business as currently conducted and as currently proposed to be conducted, such permits, approvals, and licenses are in full force and effect, no violations are or have been recorded in respect of any thereof and no proceeding is pending or, to the knowledge of the Seller, threatened to revoke or limit any such permit, approval, or license. Schedule 2.13 contains a true and complete list of all such permits, approvals, and licenses under which the Seller is operating or bound; the Seller is not in default, or to the Seller's actual knowledge, alleged to be in default under any such permit, approval, or license, and the Seller has

furnished to Purchaser true and complete copies thereof. Except as set forth in Schedule 2.13, each permit, approval, or license described above shall be in full force and effect immediately following the Closing and shall not expire or terminate as a result of the transactions contemplated by this Agreement.

### 2.14   Environmental Laws.

The Seller is not required to obtain or maintain any permits, licenses, or other authorizations for the conduct of the Business under any federal, material state and material local laws and the regulations promulgated thereunder relating to pollution or protection of the environment (collectively, "Environmental Laws"). The Seller is materially in compliance with all applicable Environmental Laws. There are no pending or, to the actual knowledge of the Seller, threatened actions, suits, proceedings, or investigations of any nature involving the Seller or any properties owned or leased by the Seller arising under any Environmental Laws.

### 2.15   Material Contracts.

Set forth in Schedule 2.15 is a true and complete list of each contract, agreement and commitment of the Seller which (i) involves the future receipt or expenditure by the Seller of more than Five Thousand and No/100 Dollars ($5,000), or (ii) if breached, terminated or allowed to expire could have a Material Adverse Effect on the Seller (each a "Material Contract" and collectively, the "Material Contracts"). All of the Material Contracts are valid, binding and enforceable against the Seller and, to the knowledge of the Seller, the other parties thereto, in accordance with their respective terms. The Seller has performed all obligations required to be performed by it and is not in default under or in breach of, nor in receipt of any claim of default or breach under any Material Contract. No event has occurred which with the passage of time or the giving of notice or both would result in a default, breach or event of noncompliance by the Seller or, to the Seller's actual knowledge, any other party under any Material Contract. With respect to each Material Contract: (i) the transactions contemplated by this Agreement will not result in a breach of or default under such Material Contract, or otherwise cause such Material Contact to cease to be legal, valid, binding, enforceable and in full force and effect on identical terms following the Closing; (ii) the Seller has not received notice of the intention of any party to such Material Contract to cancel, terminate or renegotiate such Material Contract; and (iii) to the Seller's actual knowledge, there has not been any breach or anticipated breach by any other party to such Material Contract. The Seller has provided to the Purchaser a true and correct copy of all written contracts which are required to be disclosed hereunder and a written description of all oral contracts required to be disclosed hereunder, in each case together with all amendments, waivers, or other changes thereto.

### 2.16   Tax Matters.

(a)   The Seller has timely filed all tax returns that it was required to file. All such tax returns are correct and complete in all material respects. All taxes owed by the Seller (whether or not shown on any tax return) have been timely paid. The Seller is not currently the beneficiary of any extension of time within which to file any tax return. The Seller has not received any notice or inquiry from any jurisdiction where the Seller has not filed tax returns to the effect that such filings may be required or that the Seller, the Business, and/or the Purchased Assets may otherwise be subject to taxation by such jurisdiction. There are no liens on any of the assets of the Seller (including, without limitation, the Purchased Assets) that arose in connection with any failure (or alleged failure) to pay any tax. The Seller has not waived any statute of limitations in respect of taxes or agreed to any extension of time with respect to a tax assessment or deficiency. The Seller is not a party to or bound by any tax allocation or sharing Contract. The Seller has no liability or potential liability for the taxes of any other Person as a transferee or successor, by Contract, or otherwise.

(b)     The Seller has withheld and paid all taxes required to have been withheld and paid in connection with amounts paid or owing to any employee, independent contractor, creditor, stockholder, or other third party.

(c)     No domestic or foreign, federal, state, or local tax audits or administrative or judicial tax proceedings are pending or, to the Seller's actual knowledge, being conducted with respect to the Seller. The Seller has not received from any domestic or foreign, federal, state, or local governmental authority (including jurisdictions where the Seller has not filed tax returns) any (i) written notice indicating an intent to open an audit or other review, (ii) request for information related to tax matters, or (iii) notice of deficiency or proposed adjustment for any amount of tax proposed, asserted, or assessed by any taxing authority against the Seller.

(d)     Schedule 2.16 lists all the states and localities with respect to which the Seller is required to file any corporate, income or franchise tax returns and sets forth whether the Seller is treated as the equivalent of an S corporation by or with respect to each such state or locality. The Seller has properly filed tax returns with and paid and discharged any liabilities for taxes in any states or localities in which it is subject to corporate income or franchise tax.

2.17    [INTENTIONALLY OMITTED]

2.18    [INTENTIONALLY OMITTED]

2.19    Purchased Assets.

Except for the first lien of First Capital to be released at Closing, the Seller has good and marketable title to all of the Purchased Assets, free and clear of all Liens and restrictions on transfer. All of the Purchased Assets are in good operating condition and repair (subject to normal wear and tear). The Purchased Assets constitute all the properties, assets and rights forming a part of, used, held or intended to be used in, and all such properties, assets and rights as are necessary in the conduct of, the Business. All of the Purchased Assets are located in Dallas, Texas, Irving, Texas, Atlanta, Georgia, and Bridgewater, New Jersey.

2.20    Accounts Receivable.

All accounts receivable of the Seller (both billed or accrued) that are reflected on the Closing Balance Sheet or on the accounting records of the Seller as of the Closing Date (collectively, the "Accounts Receivable") represent or will represent valid obligations arising from bona fide sales actually made or services actually performed and properly documented in the ordinary course of business with unaffiliated third parties, and the goods and services involved have been sold, delivered and performed to the account obligors, and no further goods are required to be provided and no further services are required to be rendered in order to complete the sales and fully render the services and to entitle the Seller to collect such accounts receivable in full. Except as disclosed on Schedule 2.20, such accounts receivable have not been assigned or pledged to any other person. Except as disclosed on Schedule 2.20, the Accounts Receivable are or will be as of the Closing Date current and collectible.

2.21    [INTENTIONALLY OMITTED]

2.22    Intellectual Property.

The Seller owns, or has the legal right to use, the Intellectual Property necessary for the Seller to conduct its business as currently conducted and as currently proposed to be conducted. No claim has been asserted and is pending by any third party challenging or questioning the use of any such Intellectual

Property or the validity or effectiveness of any such Intellectual Property, nor does the Seller know of any such claim, and, to the Seller's actual knowledge, the use of such Intellectual Property by the Seller does not infringe on the rights of any third party. The Seller does not own or hold (a) any patent issued by any governmental authority, (b) any patent application pending with any governmental authority, (c) any license to use any patent, (d) any trademark registered with any governmental authority, (e) any license to use any trademark, (f) any copyright registered with any governmental authority, (g) any license to use any copyright, (h) any mask work registered with any governmental authority, or (i) any license to use any mask work.

### 2.23    Customers; Suppliers.

Schedule 2.23 lists, by dollar volume paid for the year ended August 31, 2007, the twenty (20) largest customers of the Seller (collectively, the "Major Customers") and the twenty (20) largest suppliers of the Seller (collectively, the "Major Suppliers"). The Seller's relationships with the Major Customers and the Major Suppliers are reasonable commercial working relationships and: (i) all amounts owing from the Major Customers or to the Major Suppliers, if not in dispute, have been paid in accordance with their respective terms; (ii) none of the Major Customers or the Major Suppliers within the last twelve (12) months has threatened in writing to cancel, or otherwise terminate, the relationship of such Person with the Seller; and (iii) none of the Major Customers or the Major Suppliers during the last twelve (12) months has decreased materially or threatened to decrease or limit materially, its relationship with the Seller or, to the Seller's actual knowledge, intends to decrease or limit materially its purchases from, or sales to, the Seller.  The Seller has never been suspended or debarred from bidding on contracts or subcontracts to provide services to any governmental authority, and no suspension or debarment action been contemplated, threatened, or commenced against the Seller.

### 2.24    ERISA Matters.

Neither the Seller nor any person that could be treated as a single employer of Seller pursuant to Section 414(b), (c), (m) or (o) of the Code (an "ERISA Affiliate") maintains, sponsors, contributes to, has any obligation to contribute to, or has any liability or potential liability under or with respect to, any employee benefit plan, arrangement, policy or commitment (whether or not an employee benefit plan within the meaning of Section 3(3) of the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), including, but not limited to, any deferred compensation, executive compensation, bonus, incentive, pension, profit sharing, savings, retirement, stock option, stock purchase, or severance pay plan, any life, health, disability or accident insurance plan, or any holiday or vacation practice.

### 2.25    Employees; Labor Relations.

(a)    Schedule 2.25 contains a true and complete list of all current officers and directors of the Seller and all current employees, independent contractors and consultants of the Seller, along with the current position and current salary and bonus for each such person.  The Seller is not delinquent in payments to any of its officers, directors, employees, independent contractors or consultants for any wages, salaries, commissions, bonuses or other compensation for any services performed by them or material amounts required to be reimbursed to such officers, directors, employees, independent contractors or consultants. To the Seller's actual knowledge, no officer or employee of the Seller or other person is in violation of any term of any material employment contract, independent contractor agreement for services, patent disclosure agreement, confidentiality and invention assignment agreement or any other Contract relating to the relationship of such officer, employee or other person with the Seller or any other party because of the nature of the business conducted or currently proposed to be conducted by the Seller.  As of the date hereof, no employee, officer, director, consultant or agent of the Seller whose annual compensation exceeds Ten Thousand and No/100 Dollars ($10,000), or group of employees has informed the Seller of their intention to terminate employment with the Seller.  The Seller has paid in full

to all of its employees all wages, salaries, commissions, bonuses, benefits, and other compensation due and payable to such employees.

(b) Schedule 2.25(b) sets forth all collective bargaining, labor, or similar agreements, including material local or side agreements, in effect to which the Seller is a party or by which the Seller is bound or which otherwise relate to the Business (collectively, the "Labor Agreements"). Copies of all Labor Agreements have been provided to the Purchaser. The Seller has complied with all of its obligations under each Labor Agreement, and the Seller is not in default under any Labor Agreement. The Seller has no union representation of the Seller's employees.

(c) To the best of the Seller's actual knowledge (a) the Seller is in compliance in all material respects with all Applicable Laws respecting labor, employment and employment practices, terms and conditions of employment and wages and hours and federal affirmative action laws and regulations; (b) there is no unfair labor practice complaint against the Seller pending before the National Labor Relations Board or any comparable governmental authority; (c) there is no labor strike, dispute, slowdown or stoppage actually pending or, to the Seller's actual knowledge, threatened against or involving the Seller; and (d) neither any grievance nor any arbitration proceeding arising out of or under collective bargaining agreements is pending and, to the Seller's actual knowledge, no claim therefore has been asserted against the Seller.

2.26    Insurance.

The Seller maintains such policies of fire and extended coverage casualty, public liability and property damage, general liability and cargo, insurance and bonding, worker's compensation, business interruption, malpractice, and other forms of insurance in such amounts, with such deductibles, and against such risks and losses as are reasonable for the Seller's business and assets.

2.27    Certain Business Relationships.

(a) No current or former director, officer, stockholder, or Affiliate of the Seller is now, or has been since the inception of the Seller a party to any transaction or arrangement (whether written or oral) with the Seller (including, but not limited to, any Contract providing for the furnishing of services by, or rental of real or personal property from, or borrowing money from, or otherwise requiring payments to, any such Principal, director or officer of the Seller or associate thereof).

(b) No current or former director, officer, stockholder, or Affiliate of the Seller (i) owns or holds, directly or indirectly, any asset, property or right, tangible or intangible, which is used or useful in the Business, (ii) has any claim, charge or cause of action against the Seller, other than claims for reasonable unreimbursed travel or entertainment expenses, accrued vacation pay or accrued benefits under any Plan existing on the date hereof, or (iii) owes any money to the Seller.

(c) No current or former director, officer, stockholder, or Affiliate of the Seller has (i) engaged in competition with the Seller with respect to any line of the products or services of the Seller (a "Competing Business") in any market presently served by the Seller, except for ownership of less than one percent (1%) of the outstanding capital stock of any Competing Business that is publicly traded on any recognized exchange or in the over-the-counter market, or (ii) owns an interest in a vendor of the Seller, except for the ownership interest of Richard Parmer in and to Delivery Network Associates, Inc.

2.28    Sales Warranties.

No product or service sold or delivered by the Seller is subject to any guaranty or warranty (whether express or implied) given by the Seller.

2.29    Certain Business Practices.

The Seller has not taken any action which would cause it to be in violation of the Foreign Corrupt Practices Act of 1977, as amended, or any rules and regulations thereunder. The Seller has not paid any commission or made any payment whether to secure business or otherwise to any Person which in the hands of such Person would in accordance with the relevant Applicable Law be regarded as illegal or improper. No director, officer, employee, agent or other Person acting on behalf of the Seller has been a party to the use of any assets of the Seller for unlawful contributions, gifts, entertainment or other unlawful expenses relating to any activity, including any political activity, or to the establishment or maintenance of any unlawful or unrecorded fund of monies or other assets, or to the making of any false or fictitious entries in the books or records of the Seller, or to the making of any unlawful payment.

ARTICLE III

REPRESENTATIONS AND WARRANTIES OF THE PURCHASER

The Purchaser hereby represents and warrants to the Seller that the following representations and warranties are true and correct as of the Closing Date.

3.1    Organization and Existence.

The Purchaser is a limited liability company duly formed, validly existing and in good standing under the laws of the State of Delaware.

3.2    Execution and Effect of Agreement.

The Purchaser has full corporate power and authority to execute and deliver this Agreement and each other Transaction Document to which it is a party, to perform its obligations hereunder and thereunder, and to consummate the Acquisition.  The execution, delivery and performance by the Purchaser of this Agreement and the other Transaction Documents to which it is a party and the consummation by the Purchaser of the Acquisition have been duly and validly authorized and approved by the Purchaser. This Agreement and the other Transaction Documents to which the Purchaser is a party have been duly and validly executed and delivered by the Purchaser and (assuming the valid execution and delivery thereof by the Seller and any other parties thereto) constitute the legal, valid and binding obligations of the Purchaser, enforceable against the Purchaser in accordance with their respective terms, except as limited by the Bankruptcy and Equity Exceptions.

3.3    Full Authority.

The Purchaser has the full power and authority to (a) own and/or hold under lease its assets and properties (including, without limitation, the Purchased Assets), and carry on its business (including, without limitation the Business) as currently conducted and as proposed to be conducted.

3.4    No Brokers.

Neither the Purchaser nor any person acting on behalf of the Purchaser has agreed to pay a commission, finder's or investment banking fee, or similar payment in connection with this Agreement or any matter related hereto to any person, nor has any such person taken any action on which a claim for any such payment could be based.

3.5     Financial Capabilities.

The Purchaser, joined by its direct and indirect parent Affiliates, currently have and will during the entire period of the Earn Out Payments continue to have the ability to meet all of the Purchaser's financial obligations under this Agreement, including without limitation, as to the Assumed Liabilities and the Earn Out Payments.

ARTICLE IV

COVENANTS

4.1     Employee Matters.

(a)     The Seller agrees to continue the employment of all employees of the Business (each, a "Blue Wing Employee" and collectively, the "Blue Wing Employees") and shall provide all regular employee benefits to the Blue Wing Employees until 11:59 p.m. on October 19, 2007 (or such other date and time as may be agreed upon by Seller and Buyer in writing) (the "Employee Cutoff Time"). The Seller shall be required to pay all Blue Wing Employees for services rendered through the Employee Cutoff Time and shall also be responsible for the related payroll and benefits costs through the Employee Cutoff Time.

(b)     The Seller agrees to terminate the employment of all Blue Wing Employees immediately upon expiration of the Employee Cutoff Time. Purchaser shall have the right, but not the obligation, to hire all or any portion of the Blue Wing Employees upon such terms and conditions as shall be determined by Purchaser in its discretion.

4.2     Freight Forwarding Acquisitions.

The Purchaser and its direct and indirect parent Affiliates shall make all acquisitions of "Freight Forwarding Businesses" by and through the Purchaser entity during the entire period of the Earn Out Payments. The Purchaser shall provide quarterly and annual financial reports and results of operations to the Seller during the entire period of the Earn Out Payments. Further, the Purchaser shall provide notice to the Seller of all such acquisitions, mergers, consolidations and the like relating to the Freight Forwarding Businesses during the entire period of the Earn Out Payments. For purposes of this Agreement, the term "Freight Forwarding Businesses" shall be deemed to mean those organizations possessing a freight forwarding license engaged primary in the business of shipping on an expedited basis via ground, domestic air, ocean and/or international air.

4.3     Bulk Transfer Laws.

Each of the Purchaser and the Seller hereby waives compliance by the other party with any applicable bulk sale or bulk transfer laws of any jurisdiction in connection with the sale of the Purchased Assets to the Purchaser (other than any obligations of the Seller with respect to the application of the proceeds therefrom); provided that the Seller shall indemnify the Purchaser for any Losses that the Purchaser incurs as a result of any failure by the Seller to comply with applicable bulk sale or bulk transfer laws or similar laws.

4.4     Change of Name.

On or before the Closing Date, the Seller shall (a) amend its charter and take all other actions necessary to change its name to one sufficiently dissimilar to the Seller's present name, in the Purchaser's judgment, to avoid confusion, and (b) take all actions requested by the Purchaser to enable the Purchaser

to change its name to "Blue Wing." From and after the Closing Date, the Seller shall make no further use of (a) the name "Blue Wing" or any derivative thereof, or (b) any other name that, in the Purchaser's reasonable judgment, is sufficiently similar to "Blue Wing" so as to potentially cause confusion.

4.5     Confidential Information.

The Seller shall (i) keep secret and hold in the strictest confidence all of the Confidential Information (as defined below), (ii) not disclose any Confidential Information to any third party, and (iii) deliver promptly to the Purchaser or destroy, at the request and option of the Purchaser, all tangible embodiments (and all copies) of the Confidential Information which are in the Seller's possession. In the event that the Seller is requested or required (by oral question or request for information or documents in any legal proceeding, interrogatory, subpoena, civil investigative demand, or similar process) to disclose any Confidential Information, the Seller will notify the Purchaser promptly of the request or requirement so that Purchaser may seek an appropriate protective order or waive compliance with the provisions of this Section 4.5. If, in the absence of a protective order or the receipt of a waiver hereunder, the Seller is, on the advice of counsel, compelled to disclose any Confidential Information to any tribunal or else stand liable for contempt, then the Seller may disclose the Confidential Information to such tribunal; provided, however, that the Seller shall use his or its reasonable best efforts to obtain, at the reasonable request of the Purchaser and at the Purchaser's expense, an order or other assurance that confidential treatment will be accorded to such portion of the Confidential Information required to be disclosed as the Purchaser shall designate. "Confidential Information" means any and all information concerning the Business and/or the Purchased Assets that is not generally available to the public as of the date hereof.

4.6     Restrictions on Competition.

During the Restricted Period (as defined below), the Seller will not, without the Purchaser's prior written consent, directly or indirectly, alone or as a director, officer, employee, agent, consultant, independent contractor, stockholder, partner, manager, member, joint venturer, or owner of (or as a lender or financier to) any company, business, enterprise, or entity, engage in the Restricted Business (as defined below) within the Restricted Area (as defined below). The Seller's ownership of not more than 1.0% of the shares of stock of any corporation having a class of equity securities actively traded on a national securities exchange or on the Nasdaq National Market System shall not be deemed, in and of itself, to violate the prohibitions of this Section. As used in this Article IV, (x) the term "Restricted Area" means the respective geographical areas within a two hundred fifty (250) mile radius of the location of any parcel of Leased Real Property, (y) the term "Restricted Business" means transportation and transportation-related services, including, but not limited to, non-asset based third party logistics management, truckload and less-than-truckload (LTL) transportation, international shipping, intermodal (rail), air/ocean, dedicated contract carriage, warehousing, freight forwarding, pool distribution, cross-docking, packaging, and other value-added services, and (z) the term "Restricted Period" means the period commencing on the Closing Date and ending on the third anniversary thereof.

4.7     Nonsolicitation.

During the Restricted Period, the Seller will not, without the Purchaser's prior written consent, directly or indirectly, alone or as a director, officer, employee, agent, consultant, independent contractor, stockholder, partner, manager, member, joint venturer, or owner of (or as a lender or financier to) any company, business, enterprise, or entity, (i) solicit or induce (or attempt to solicit or induce) any client, customer, supplier, business partner, technology partner, contractor, licensor, licensee, landlord, lessor, or other entity with whom the Seller or the Business had a business relationship prior to the Closing to refrain from or cease doing business with (or alter or reduce its business relationship with) the Purchaser, or to commence a similar business relationship with any other individual or entity, (ii) solicit, encourage or induce (or attempt to solicit, encourage or induce) any of the Purchaser's employees or service

contractors to leave the employ or service of the Purchaser, or in any way interfere with the relationship between the Purchaser and its employees and/or service contractors working for or on behalf of the Purchaser, and/or (iii) hire or engage or attempt to hire or engage for employment any person who was an employee of the Purchaser until six (6) months after such person's employment with the Purchaser has ended.

4.8     Nature of Restrictions; Enforcement.

(a)     The Seller hereby acknowledges and agrees that the restrictions and covenants set forth in Section 4.5, Section 4.6, and Section 4.7 of this Agreement (i) are in consideration of the Purchaser's agreements under the Purchase Agreement, and (ii) are fair and reasonable, in terms of scope, subject matter, geographic area, duration, and otherwise, and that the protections afforded to the Purchaser thereunder are necessary to protect its legitimate business interests.  In addition, the Seller acknowledges and agrees that the potential harm to the Purchaser of the non-enforcement of the provisions of Section 4.5, Section 4.6, and/or Section 4.7 hereof outweighs any harm to the Seller of their enforcement by injunction or otherwise.  The Seller agrees that each provision of Section 4.5, Section 4.6, and Section 4.7 hereof shall be treated as a separate and independent clause, and the unenforceability of any one clause shall in no way impair the enforceability of any of the other clauses hereof.  Moreover, the Seller agrees that if one or more of such provisions shall for any reason be held to be unenforceable, such provision or provisions shall be construed by the appropriate judicial body so as to be enforceable to the maximum extent compatible with applicable law.

(b)     The Seller acknowledges and agrees that any breach of the provisions of Section 4.5, Section 4.6, and/or Section 4.7 of this Agreement will cause irreparable harm to the Purchaser.  Accordingly, the Seller acknowledges and agrees that the Purchaser shall be entitled, in addition to any other remedies that may be available at law or in equity (including, without limitation, monetary damages), to obtain injunctive or other equitable relief in connection with any breach or threatened breach thereof, without the necessity of posting bond or other security, and the Seller hereby agrees to waive the defense that there is an adequate remedy at law in any action, suit, or proceeding relating to such injunctive or other equitable relief.

(c)     In addition to any other remedies that Buyer may seek and obtain pursuant to this Agreement, the duration of the restrictions set forth in Section 4.6 and/or Section 4.7 hereof shall be extended by any and all periods of time during which Seller shall be found by a court of competent jurisdiction (or arbitrator) to have been in violation of any provision thereof.

(d)     The provisions of Section 4.5, Section 4.6, and Section 4.7 hereof shall survive the termination or expiration of this Agreement.

4.9     Sale of the Purchaser or its Assets.

The Purchaser hereby acknowledges and agrees that the willingness of the Seller to agree to the Earn Out Payment as consideration for the Transaction contemplated herein is entered into with the good faith belief of the Seller that no change in the ownership or control of the Purchaser shall occur during the entire term of the Earn Out Payments.  Should the direct or indirect owners of the Purchaser elect to sell substantially all of the assets of the Purchaser or enter into any similar transaction other than a sale of all of the membership interest or other equity of the Purchaser (each, a "Sales Transaction"), the Purchaser shall notify the Seller in writing prior to executing any letter of intent or similar agreement of the Purchaser to enter into a Sales Transaction in order to permit the Seller or its Affiliates to enter into good faith negotiations with the Purchaser or its Affiliates to allow the Seller to either (i) cause the Earn Out Payment obligations to be assumed by the purchaser in a Sales Transaction, or (ii) discuss a final settlement as to the obligations of the Purchaser relating to the Earn Out Payment.

4.10    Pre-Closing Covenants.

The parties hereto agree as follows with respect to the period between the execution of this Agreement and the Closing:

(a)    The Seller will keep its business and properties (including, without limitation, the Purchased Assets) substantially intact and will not sell, assign, transfer, or otherwise dispose of the Purchased Assets (or any portion thereof) without the prior written consent of the Purchaser.

(b)    The Seller will give prompt written notice to the Purchaser of any material adverse development causing a breach of any of the representations and warranties in Article II above. Purchaser will give prompt written notice to the Seller of any material adverse development causing a breach of any of the representations and warranties in Article III above. No disclosure by the Seller or the Purchaser pursuant to this Section, however, shall be deemed to prevent or cure any misrepresentation, breach of warranty, or breach of covenant hereunder.

(c)    The Seller will not (i) solicit, initiate, or encourage the submission of any proposal or offer from any person relating to the acquisition of any capital stock or other voting securities, or any substantial portion of the assets, of the Seller (including any acquisition structured as a merger, consolidation, or share exchange), or (ii) participate in any discussions or negotiations regarding, furnish any information with respect to, assist or participate in, or facilitate in any other manner any effort or attempt by any person to do or seek any of the foregoing.  The Seller will notify the Purchaser immediately if any person makes any proposal, offer, inquiry, or contact with respect to any of the foregoing. If the Seller breaches any of the provisions of this Section 4.10(c), then the Seller immediately shall pay to the Purchaser an amount equal to all out-of-pocket expenses (including, but not limited to, travel expenses and reasonable legal and accounting fees) incurred by the Purchaser in connection with the transactions contemplated by this Agreement.  The Seller's obligations under the immediately preceding sentence shall survive the termination of this Agreement.

## ARTICLE V

## CONDITIONS TO THE CLOSING

5.1    Conditions to the Obligations of the Seller to Effect the Closing.

The obligations of the Seller to consummate the Acquisition shall be subject to the satisfaction or waiver of each of the following conditions:

(a)    Purchase Price.  The Purchaser shall deliver by wire transfer in immediately available funds to one or more accounts designated by the Seller, the consideration payable to the Seller as of the Closing pursuant to Section 1.5.

(b)    Manager's Certificate.  The Purchaser shall execute and deliver to the Seller a certificate dated as of the Closing Date and signed by a manager of the Purchaser certifying that: (i) all of the representations and warranties of the Purchaser contained in this Agreement are true and correct in all material respects; (ii) all of the terms, covenants and conditions of this Agreement to be complied with or performed by the Purchaser have been duly complied with and performed in all material respects as of the Closing Date; (iii) attached to such certificate are true and correct copies of (1) the Certificate of Organization of the Purchaser, (2) the company or operating agreement of the Purchaser; and (3) the resolution of the sole Manager of the Purchaser approving the Purchaser's execution of this Agreement and the other Transaction Documents to which the Purchaser is a party.

(c)     Assignment and Assumption Agreement. The Purchaser shall execute and deliver to the Seller the Assignment and Assumption Agreement.

(d)     Additional Documents. The Seller shall receive such other documents and instruments from the Purchaser as the Seller deems reasonably necessary to consummate the Acquisition, including without limitation, consents of the landlords of the Leased Real Property and other consents of third parties deemed necessary by the Seller.

(e)     Texas Qualification. The Purchaser shall duly qualify to do business in the State of Texas.

5.2     Conditions to the Obligations of the Purchaser to Effect the Closing.

The obligations of the Purchaser to consummate the Acquisition shall be subject to the satisfaction or waiver of each of the following conditions:

(a)     Assignment and Assumption Agreement. The Seller shall execute and deliver to the Purchaser the Assignment and Assumption Agreement.

(b)     Assignment of Leasehold Interest. The Seller shall execute and deliver to the Purchaser an assignment of leasehold interest, substantially in the form agreed by the Parties and the Seller's landlords, assigning all of the Seller's right, title and interest to, and obligations related to the Leased Real Property and all buildings and fixtures located thereon;

(c)     Lien Releases. The Seller shall deliver to the Purchaser evidence that all Liens regarding the Purchased Assets have been released in form and substance reasonably satisfactory to the Purchaser and that all amounts owing under any Indebtedness has been paid in full or otherwise terminated, including, but not limited to: (i) delivery of a stamp-filed UCC-3 Termination Statement releasing any and all Liens on the Purchased Assets held by any creditor of the Business; (ii) any contract creating a capital lease obligation; and (iii) any contract for the sale of accounts receivable.

(d)     Officer's Certificate; Corporate Documents. The Seller shall execute and the Shareholder shall cause their respective officers to execute and deliver to the Purchaser a certificate dated as of the Closing Date and signed by the officers of the Seller certifying that: (i) all of the representations and warranties of the Seller contained in this Agreement are true and correct in all material respects as of the Closing Date; (ii) all of the terms, covenants and conditions of this Agreement to be complied with or performed by each of the Seller and the Shareholder have been duly complied with and performed in all material respects as of the Closing Date; (iii) attached to such certificate are true and correct copies of (1) the certificate or articles of incorporation or formation, as applicable, of the Seller (including all amendments thereto), (2) the bylaws or other organizational documents, as applicable, of the Seller (including all amendments thereto), (3) resolutions of the Board of Directors and the Shareholder of the Seller approving the Seller's execution of this Agreement and the other Transaction Documents to which the Seller is a party and the consummation of the Acquisition, and (4) a certificate of existence or good standing, as applicable, of the Seller dated as of a date not more than 10 days prior to the Closing Date and duly issued by the applicable governmental authority in each jurisdiction in which the Business is conducted and in which the conduct of the Business requires or has required qualification under applicable law, showing that the Seller is in good standing and authorized to do business in such jurisdiction.

(e)     Books and Records. The Seller shall deliver to the Purchaser copies of all books and records regarding the Purchased Assets and the Business.

(f)　　Additional Documents.  The Purchaser shall receive such other documents and instruments from the Seller and the Shareholder as the Purchaser deems reasonably necessary to consummate the Acquisition.

(g)　　Due Diligence.  Purchaser shall have completed its due diligence investigation of the Business, the Purchased Assets, the operations of the Seller, and related matters, and the results of such due diligence investigation shall be satisfactory to Purchaser in its sole and absolute discretion.

(h)　　Possession and Control.  The Seller shall provide possession and control of the Purchased Assets to the Purchaser.

(i)　　Employees.  Each of Richard Parmer and Brad Parmer shall have accepted the offers of employment with Purchaser.

(j)　　Damage to Purchased Assets.  Between the date of this Agreement and the Closing Date, there shall not have occurred any damage, destruction or loss of any of the Purchased Assets, whether or not covered by insurance.

(k)　　Consents.  All authorizations, consents, and approvals of governmental authorities or third parties that are required in connection with the execution and delivery of this Agreement, and the consummation of the transactions contemplated hereby, shall have been obtained.

(l)　　Insurance.  The Purchaser shall obtained insurance coverage with respect to the operation of the Business following the Closing on terms acceptable to the Purchaser.

5.3　　Option to Terminate Agreement.

(a)　　This Agreement may, by written notice given at or prior to the Closing in the manner herein provided, be terminated and abandoned:

(i)　　by mutual written consent of the Seller and the Purchaser;

(ii)　　by the Seller, if any of the conditions provided for in Section 5.1 above shall not have been satisfied on or before October 22, 2007; or

(iii)　　by the Purchaser, if any of the conditions provided for in Section 5.2 above shall not have been satisfied on or before October 22, 2007; or

(b)　　If this Agreement is terminated pursuant to Section 5.3(a) above, then, except as specifically provided in this Agreement, all further obligations of the parties hereunder shall terminate; provided, however, that if this Agreement is so terminated by one party because one or more of the conditions to such party's obligations hereunder is not satisfied as a result of the other party's (i) failure to comply with its obligations under any provision of this Agreement, or (ii) breach of a representation, warranty, covenant, or agreement contained herein, then, in any such case, the terminating party's right to pursue all legal remedies for breach of contract and damages shall survive such termination unimpaired.

## ARTICLE VI

## INDEMNIFICATION; REMEDIES

6.1     <u>Obligations of the Seller</u>.

In partial consideration of the commitment of the Purchaser hereunder and subject to the limitations set forth in this Article VI, the Seller agrees to indemnify, reimburse and hold harmless the Purchaser and any of its Affiliates, directors, officers, agents and employees and each other person, if any, controlling the Purchaser (each, an "<u>Purchaser Indemnified Person</u>") from and against all demands, claims, allegations, assertions, actions or causes of action, assessments, losses, damages, deficiencies, Liabilities, costs and expenses (including reasonable legal fees, interest, penalties, and all reasonable amounts paid in investigation, defense or settlement of any of the foregoing and whether or not any such demands, claims, allegations, etc., of third parties are meritorious) (collectively, "<u>Damages</u>") asserted against, imposed upon, resulting to, required to be paid by, or incurred by any Purchaser Indemnified Person, directly or indirectly, in connection with, arising out of, which could result in, or which would not have occurred but for:

(a)     any inaccuracy in, or breach of, any of the representations and warranties in Article II, the Transaction Documents to which the Seller is a party or in any certificate or document furnished pursuant hereto by the Seller on the Closing Date;

(b)     the Seller's failure to satisfy any of its obligations relating to the Retained Liabilities that adversely impacts the Purchaser;

(c)     any breach or nonfulfillment of any covenant or agreement made by the Seller of the Shareholder in or pursuant to this Agreement or in any Transaction Documents; or

(d)     any obligation of the Seller not constituting an Assumed Liability relating to the operation of the Business prior to the Closing.

6.2     <u>Obligations of the Purchaser</u>.

In partial consideration of the commitment of the Seller hereunder, the Purchaser agrees to indemnify, reimburse and hold harmless the Seller and each of its Affiliates, agents and employees and each other person, if any, controlling any of its Affiliates (each a "<u>Seller Indemnified Person</u>") from and against any Damages asserted against, imposed upon, resulting to, required to be paid by, or incurred by any Purchaser Indemnified Person, directly or indirectly, in connection with, arising out of, which could result in, or which would not have occurred but for:

(a)     any inaccuracy in, or breach of any of the representations and warranties made by the Purchaser in Article III, the Transaction Documents to which the Purchaser is a party or in any certificate or document furnished pursuant hereto by the Purchaser on the Closing Date;

(b)     any payment required to be made by the Purchaser to the Seller pursuant to this Agreement;

(c)     any obligation of the Purchaser relating to the operation of the Business after the Closing;

(d)     the Purchaser's failure to satisfy any of its obligations relating to the Assumed Liabilities that adversely impacts the Seller; or

(e)     any breach or nonfulfillment of any covenant or agreement made by the Purchaser in or pursuant to this Agreement or in any Transaction Document to which the Seller is a party.

6.3     Procedure for Claims.

(a)     Any Purchaser Indemnified Person and any Seller Indemnified Person shall each be referred to herein as an "Indemnified Person." Any Indemnified Person seeking indemnification with respect to any losses, claims, damages, liabilities or expenses shall give notice describing the claim for indemnification in reasonable detail to the Person from whom indemnification is sought (each, an "Indemnifying Person") prior to the expiration of the time period set forth in Section 6.4.

(b)     If any claim, demand, liability or obligation is asserted by any third party against any Indemnified Person, the Indemnifying Person shall have the right, unless otherwise precluded by applicable law, to conduct and control the defense, compromise or settlement of any action or threatened action brought against the Indemnified Person in respect of matters addressed by the indemnity set forth in this Article VI (an "Action").   The Indemnified Person shall promptly notify in writing the Indemnifying Person of such Action, stating with reasonable specificity the circumstances of the Indemnified Person's claim for indemnification. The Indemnified Person shall have the right to employ counsel separate from counsel employed by the Indemnifying Person in connection with any Action or threatened Action and to participate in the defense thereof. The fees and expenses of counsel employed by the Indemnified Person shall be at the sole expense of the Indemnified Person unless: (i) the Indemnifying Person shall have elected not, or, after reasonable written notice of any Action or threatened Action, shall have failed, to assume or participate in the defense thereof; (ii) the employment thereof has been specifically authorized by the Indemnifying Person in writing; or (iii) the parties to any Action or threatened Action (including any impleaded parties) include both the Indemnifying Person and the Indemnified Person and the Indemnifying Person shall have been advised in writing by counsel for the Indemnified Person that there may be one or more defenses available to the Indemnified Person that are not available to the Indemnifying Person or legal conflicts of interest pursuant to applicable rules of professional conduct between the Indemnifying Person and the Indemnified Person. If any of the events referred to in clauses (i), (ii) and (iii) above is applicable, the fees and expenses of one separate counsel employed by the Indemnified Person shall be at the expense of the Indemnifying Person.

(c)     The Indemnifying Person shall not, without the written consent of the Indemnified Person, settle or compromise any Action or threatened Action or consent to the entry of any judgment that does not include as an unconditional term thereof the giving by the claimant or the plaintiff to the Indemnified Person a release from all liability in respect of such Action or threatened Action. Unless the Indemnifying Person shall have elected not, or shall have after reasonable written notice of any Action or threatened Action failed, to assume or participate in the defense thereof, the Indemnified Person may not settle or compromise such Action or threatened Action without the written consent of the Indemnifying Person.   If, after reasonable written notice of any Action or threatened Action, the Indemnifying Person neglects to defend the Indemnified Person, a recovery against the latter for damages suffered by it in good faith, is conclusive in its favor against the Indemnifying Person; *provided, however,* that no such conclusive presumption shall be made if the Indemnifying Person has not received reasonable written notice of such Action against the Indemnified Person.

6.4     Survival.

The representations, warranties, covenants and agreements made by the parties in this Agreement, including the indemnification obligations of the Seller and the Purchaser set forth in this Article VI, shall survive the Closing and shall continue in full force and effect after the Closing, subject to the following limitations:

(a)      except as provided in Section 6.4(b) below, any claim by the Purchaser under Section 6.1(a) shall expire if notice of such claim has not been provided by the Purchaser to the Seller on or before September 21, 2009.

(b)      any claim by the Purchaser relating to any inaccuracy in, or breach of, any of the representations and warranties made by the Seller under Section 2.16 (Tax Matters), Section 2.24 (ERISA Matters), or Section 2.26 (Insurance) (collectively, the "Special Matters") shall survive until the expiration of the applicable statute of limitations; and

(c)      any claim by the Seller under Section 6.2(a) shall expire if notice of such claim has not been provided by the Seller to the Purchaser on or before September 21, 2009, with the exception of the Section 3.4 and 4.2, which shall survive as set forth therein.

6.5      Indemnity Payments.

(a)      If the Purchaser agrees to or is determined to have an obligation to indemnify or reimburse any Seller Indemnified Person under this Article VI, then the Purchaser shall promptly pay such amount to the applicable Seller Indemnified Person by wire transfer of immediately available funds to the bank and account specified by the Seller Indemnified Person in writing.

(b)      If the Seller agrees to or is determined to have an obligation to indemnify or reimburse any Purchaser Indemnified Person under this Article VI, then the Seller shall have the right of offset against the Earn Out Payment as set forth in Section 1.10.

6.6      Limitations on Indemnification Obligations Under Article VI.

(a)      Except as provided below, the Purchaser may not make any claims against the Seller under Section 6.1(a) unless and until the aggregate amount of all such claims under Section 6.1(a) exceeds US$50,000.00 (the "Basket Amount").  If the claims under Section 6.1(a) exceed the Basket Amount, then the Seller shall be responsible for the payment of all Damages including the Basket Amount.

(b)      Except as provided below, the Seller may not make any claims against the Purchaser under Section 6.2(a) unless and until the aggregate amount of all such claims under Section 6.2(a) exceeds the Basket Amount.  If the claims under Section 6.1(a) exceed the Basket Amount, then the Purchaser shall be responsible for the payment of all Damages including the Basket Amount.

6.7      Remedies.

Each party hereto acknowledges that because of the difficulty of measuring economic losses attributable to the breach of a party's obligations under this Agreement or failure to consummate the Acquisition in accordance with the terms of this Agreement, and because of the immediate and irreparable damage that would be caused for which there would be no other adequate remedy, the parties hereby agree that the applicable provisions of this Agreement may be enforced against the breaching party by a decree of specific performance issued by any court of competent jurisdiction, and appropriate injunctive relief may be applied for and granted in connection therewith.  Each party hereby agrees to waive the defense that a remedy at law would be adequate in any action for specific performance under this Section 6.7.

6.8     Right of Offset.

With respect to any Damages as to which Purchaser is entitled to indemnification pursuant to this Article VI, Purchaser shall have the right to offset such Damages against the Earn Out Payments.

6.9     Treatment of Indemnification Payments.

The parties hereto hereby agree that any indemnification payments made pursuant to this Agreement shall be treated for tax purposes as adjustments to the Purchase Price unless otherwise required by applicable law.

## ARTICLE VII

### GENERAL PROVISIONS

7.1     Press Releases.

Except as provided below, neither the Seller, the Shareholder nor their directors, officers, employees, advisors, lenders, attorneys or agents shall make any press release or public announcement in connection with the Acquisition without the prior written consent of the Purchaser.

7.2     Expenses.

Whether or not the Acquisition is consummated: (a) the Purchaser shall pay all of its legal, accounting, due diligence and other out-of-pocket expenses incident to the Acquisition; and (b) the Seller shall pay all of its legal, accounting, and other out-of-pocket expenses incident to the Acquisition.

7.3     Amendments and Waivers.

Any term of this Agreement may be amended, supplemented or modified, only with the written consent of each of the parties hereto, and the observance of any term of this Agreement may be waived (either generally or in a particular instance and either retroactively or prospectively), only with the written consent of the party against whom the waiver is sought to be enforced.  No waiver of any of the provisions of this Agreement shall be deemed or shall constitute a waiver of any other provision hereof (whether or not similar), nor shall such waiver constitute a continuing waiver unless otherwise expressly provided.

7.4     Successors and Assigns.

This Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective successors and permitted assigns.  Except as provided below, this Agreement and all rights and obligations of the parties hereunder may not be assigned or transferred without the prior written consent of the other parties hereto.  The Purchaser may designate one or more of its Affiliates to perform its obligations hereunder (in any or all of which cases the Purchaser nonetheless shall remain responsible for the performance of all of its obligations hereunder).

7.5     No Third Party Beneficiaries.

The rights created by this Agreement are only for the benefit of the parties hereto, and no Person (other than parties to this Agreement or their respective successors or permitted assigns) shall have or be construed to have any legal or equitable right, remedy or claim under or in respect of or by virtue of this Agreement or any provision contained herein; *provided, however*, that the provisions of Article VI above

concerning indemnification are intended for the benefit of the parties specified therein, and their respective legal representatives, successors and assigns.

7.6     Choice of Law.

This Agreement shall be governed by and construed under, and the rights of the parties determined in accordance with, the laws of the State of Texas (without reference to the choice of law provisions of the State of Texas), except with respect to matters of law concerning the internal corporate affairs of any corporate entity which is a party to or the subject of this Agreement. Such matters shall be governed by the law of the jurisdiction under which such entity derives its powers.

7.7     Jurisdiction; Service of Process.

Any action or proceeding seeking to enforce any provision of, or based on any right arising out of, this Agreement may be brought against any of the parties in the courts of the State of Texas, County of Dallas, or, if it has or can acquire jurisdiction, in the United States District Court for the Northern District of Texas, and each of the parties consents to the jurisdiction of such courts (and of the appropriate appellate courts) in any such action or proceeding and waives any objection to venue laid therein.

7.8     Waiver of Jury Trial.

EACH PARTY HERETO HEREBY IRREVOCABLY WAIVES ALL RIGHT TO TRIAL BY JURY IN ANY PROCEEDING (WHETHER BASED IN CONTRACT, TORT OR OTHERWISE) ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY TRANSACTION OR AGREEMENT CONTEMPLATED HEREBY OR THE ACTIONS OF ANY PARTY HERETO IN THE NEGOTIATION, ADMINISTRATION, PERFORMANCE OR ENFORCEMENT HEREOF.

7.9     Notices.

Unless otherwise provided, any notice required or permitted under this Agreement shall be given in writing and shall be deemed effectively given upon the earlier of: (a) personal delivery to the party to be notified; (b) receipt after deposit with the United States Post Office, by registered or certified mail, postage prepaid return receipt requested; (c) the next business day after dispatch via a nationally recognized overnight courier; or (d) confirmation of transmission by facsimile or electronic mail (provided such transmission is also contemporaneously sent via one of the methods specified in clauses (a), (b) or (c)), all addressed to the party to be notified at the address indicated below for such party, or at such other address as such party may designate by five days' advance written notice to the other parties. Notices should be provided in accordance with this Section to the following addresses:

| | |
|---|---|
| If to the Purchaser, to: | With a copy to (which shall not constitute notice): |
| BW/STS ACQUISITION LLC<br>90 S. Newtown Street Road<br>Suite 11<br>Newtown Square, PA 19073<br>Fax: (610) 359-1350<br>Attn: Dennis O'Neill | O B E R \| K A L E R<br>Attorneys at Law<br>120 East Baltimore Street<br>Baltimore, Maryland 21202<br>Fax: (443) 263-7502<br>Attn: Kevin M. Robertson |
| If to either Seller, to: | With a copy to (which shall not constitute notice): |
| Blue Wing Global Logistics, Inc.<br>17060 N. Dallas Parkway, Suite 214 | Bellinger & DeWolf, L.L.P.<br>10,000 N. Central Expressway, Suite 900 |

Dallas, Texas 75248                          Dallas, Texas 75231
Fax: (972) 248-3732                          Fax: (214) 954-9541
Attn: Richard Parmer                         Attn: H. Len Musgrove, Jr.

7.10    Severability.

    If one or more provisions of this Agreement shall be held invalid, illegal or unenforceable, such provision shall, to the extent possible, be modified in such manner as to be valid, legal and enforceable but so as to most nearly retain the intent of the parties, and if such modification is not possible, such provision shall be severed from this Agreement. In either case, the balance of this Agreement shall be interpreted as if such provision were so modified or excluded, as the case may be, and shall be enforceable in accordance with its terms.

7.11    Entire Agreement.

    This Agreement, together with the exhibits and schedules hereto, constitutes the entire agreement among the parties with respect to the subject matter hereof and supersedes all prior understandings and agreements, whether written or oral, and no party shall be liable or bound to any other party in any manner by any warranties, representations or covenants except as specifically set forth herein.

7.12    Construction.

    The parties have participated jointly in the negotiation and drafting of this Agreement. In the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the parties and no presumption or burden of proof shall arise favoring or disfavoring any party by virtue of authorship of any provision of this Agreement.

7.13    Titles and Subtitles.

    The titles and subtitles used in this Agreement are for convenience only and are not to be considered in construing or interpreting this Agreement.

7.14    Counterparts.

    This Agreement may be executed in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

*[Signatures appear on next page]*

**IN WITNESS WHEREOF**, the parties hereto have caused this Agreement to be executed and delivered as of the date first written above.

BW/STS ACQUISITION LLC

By: _____
         Thomas Torcomian, General Manager


BLUE WING GLOBAL LOGISTICS, INC.

By: _____
Name: _____
Title:        President


BLUE WING TRANSPORTATION, INC.

By: _____
Name: _____
Title:        President

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | | |
|---|---|---|
| **IN RE:** | § | |
| | § | |
| **BLUE WING GLOBAL LOGISTICS,** | § | **CASE NO. 08-34834** |
| | § | **CHAPTER 7** |
| **Debtor** | § | |

# EXHIBIT C

**BLUE WING GLOBAL LOGISTICS, INC.**
**Profit and Loss**
**For the Six Months Ended June 30, 2007**
**(Unaudited)**

|  | Six Months |
|---|---|
| **REVENUE** | $ 7,221,160 |
| **COST OF TRANSPORTATION** |  |
| Freight Costs | $5,005,715 |
| Loss Damage Claim | 22,865 |
| EDI Fee | 17,973 |
| Dock & Warehouse Supplies | 15,051 |
| Exchange Rate Variance | 51 |
| Total Cost of Transportation | 5,061,655 |
| **NET REVENUE** | 2,159,504 |
| **OPERATING EXPENSES** |  |
| Personnel Costs | 1,862,643 |
| Supplies | 35,523 |
| Sales & Marketing Expenses | 103,886 |
| Facilities Expenses | 465,522 |
| Professional Services | 276,263 |
| Other Expenses | 100,899 |
| Total Operating Expenses | 2,844,334 |
| **OPERATING EARNINGS (LOSS) BEFORE INTEREST** | (684,830) |
| **OTHER EXPENSE/(INCOME)** |  |
| Interest Expense/Income | (212,514) |
| **NET INCOME (LOSS)** | ($897,344) |

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

IN RE:                                    §
                                          §
BLUE WING GLOBAL LOGISTICS,               §        CASE NO. 08-34834
                                          §        CHAPTER 7
            Debtor                        §

# EXHIBIT D

## EXHIBIT D

W.C. Payne Investments, LLC,
W.C. Payne, Preferred Stockholder

Fax/Blue Wing Express, LP,
Rod C. Jones, Preferred Stockholder

Cain Capital/Blue Wing, LP,
Rod C. Jones, Preferred Stockholder

EFP/Blue Wing partners,
Ballard O. Castleman, Preferred Stockholder

Cain Capital/Blue Wing, LP,
Richard Parmer, Preferred Stockholder

Warren W. Garden, President, Secretary and Sole Director

John Hickerson, Preferred Stockholder

John McManama, Preferred Stockholder